NAOMI CHUNG (CSBN 283743)
Hickey & Chung, LLP
Pier 9, Suite 100
San Francisco, CA  94111
Telephone:  (415) 942-9000
Facsimile:  (415) 484-7054
chung@defender.law

BRENDAN M. HICKEY (CSBN 261794)
Hickey & Chung, LLP
Pier 9, Suite 100
San Francisco, CA  94111
Telephone:  (415) 942-9000
Facsimile:  (415) 484-7054
hickey@defender.law

Attorneys for Defendant
YONG HENG LIANG

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>YONG HENG LIANG<br><br>　　　　Defendant | Case No. 20-CR-00321-002 EMC<br><br>**DEFENDANT YONG HENG LIANG'S SENTENCING MEMORANDUM**<br><br>Sentencing Date: March 9, 2022<br>Time: 2:30 p.m.<br>Court: Honorable Edward M. Chen |

# **TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................................... 4

II. INDIVIDUAL BEFORE THE COURT ................................................................... 4

    A. UPBRINGING ............................................................................................... 4

    B. ADULT LIFE .................................................................................................. 6

        1. Early Career ........................................................................................... 6

        2. Marriage and Family ............................................................................. 6

        3. Bay Area Tire Recycling ...................................................................... 7

    C. OFFENSE CONDUCT ................................................................................... 8

III. ARGUMENT ........................................................................................................... 10

    A. THE SENTENCING GUIDELINES ............................................................. 10

        1. Applicable Guidelines .......................................................................... 10

        2. Applicable Law ..................................................................................... 11

        3. Factors Relevant to a Sentence That is Sufficient, But Not Greater Than Necessary ............................................................................................... 12

    B. 18 U.S.C. § 3553(a) FACTORS .................................................................... 12

        1. Colin's History and Characteristics ..................................................... 12

        2. Nature and Circumstances of the Offense ............................................ 14

        3. Remorse and Post-Offense Rehabilitation ........................................... 14

        4. Seriousness of the Offense, Respect for the Law, and Just Punishment ..... 16

        5. Cooperation ........................................................................................... 18

        6. The Need for Adequate Deterrence and Protecting the Public ............. 19

IV. CONCLUSION ....................................................................................................... 20

1

**TABLE OF AUTHORITIES**

2    **Cases**

3    *Gall v. United Sates*, 552 U.S. 38, 39 (2007)..........................................................................10

4    *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) .........................................................10

5    *Pepper v. United States*, 562 U.S. 476 (2011) .....................................................................15

6    *United States v. Autery*, 555 F.3d 864 (9th Cir. 2009)..........................................................11

7    *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) ...........................................................11

8    *United States v. Carty*, 520 F.3d 987 (9th Cir. 2008) ...........................................................11

9    *United States v. Doe*, 398 F.3d 1254, 1260–61 (10th Cir. 2005) ........................................18

10   *United States v. Landrón–Class*, 696 F.3d 62, 77–78 (1st Cir. 2012) ..................................18

11   *United States v. Leiskunas*, 656 F.3d 732, 737 (7th Cir. 2011) ............................................18

12   *United States v. Massey*, 663 F.3d 852, 858 (6th Cir.2011) .................................................18

13   *United States v. Nesbeth*, 188 F.Supp. 3d 179 (E.D.N.Y. May 24, 2016)............................17

14   *United States v. Robertson*, 662 F.3d 871 (7th Cir. 2011).....................................................15

15   *United States v. Robinson*, 741 F.3d 588 (5th Cir. 2014) ......................................................18

16   *United States v. Shy*, 538 F.3d 933 (8th Cir. 2008) ..............................................................15

17   *United States v. Stewart*, 2011 U.S. Dist. LEXIS 89767 at *6-8 (D. Neb. Aug. 11, 2011)....................15

18   **Statutes**

19   § 3553(a) ......................................................................................................................10, 11, 18

20   § 3553(a)(1) .............................................................................................................................18

21   §3553(a)(3) ..............................................................................................................................11

22   18 U.S.C. § 3553(a) .................................................................................................................11

23   18 U.S.C. § 3553(a)(1)-(7)......................................................................................................11

24   18 U.S.C. § 3553(a)(2)(A)-(D) ................................................................................................11

25

26

27

28

## I.    INTRODUCTION

Yong Heng 'Colin' Liang is a kind-hearted and hardworking immigrant who has overcome most of his life's significant challenges with gentle good humor and perseverance.  After working for years to build a tire recycling business, he gave in to greed and participated in an ongoing scheme to defraud the United States government by providing shipping documents called bills of lading to a shady businessman named Michael Choy.  Choy went on to falsify those bills of lading and provided them to co-conspirators who used them to submit fraudulent tariff drawback claims to the government, resulting in improper payments of millions of dollars.  For his part in the scheme, Mr. Liang was paid $536,899.

Mr. Liang's moral failing has caused him great shame, and he has worked to make amends both to the individuals he harmed with his criminal conduct, including his wife and young son from whom he will soon be parted.  To make amends to the victims, Mr. Liang has repaid the government $536,899 he received in the scheme.[1]  He has also satisfied a default judgment related to a shipment of tires he sent which was left at a port in South Korea.  PSR at ¶ 25; Exhibit A – Acknowledgement of Satisfaction of Judgment.  He has cooperated with the government's investigation and has expressed his deep remorse to his wife and newborn son, who was conceived after years of unsuccessful fertility treatments just weeks before Mr. Liang was arrested in this case.

Mr. Liang makes no excuse for his failings, and he has worked to hold himself accountable for them.  He respectfully requests that this Court impose a sentence of 6 months imprisonment, followed by 3 years of supervised release, 300 hours of community service and a restitution order of $536,899, which he acknowledges as just punishment for his crime.

## II.    INDIVIDUAL BEFORE THE COURT

### A.    UPBRINGING

Colin Liang comes from a humble home and a traditional Chinese family who instilled in him the values of hard work, honesty, and respect for others.  He was born in a small farming village in the

---

[1] Mr. Liang provided defense counsel with a cashier's check payable to the district court in the amount of $536,899 for his restitution to the United States.  Defense counsel intends to deposit the funds into the court's registry prior to Mr. Liang's sentencing hearing.

province of Guangdong, China, where he lived until the age of fourteen.  PSR at ¶ 25.  Colin was a studious young boy consistently among the top students in his class who had humble dreams of becoming a bus driver who would be able to provide for his parents and family.  His father operated a small business manufacturing glass for light fixtures, and his mother helped package the light fixtures while caring for Colin and his sister.  His parents divorced when Colin was seven years old but continued to live under the same roof due to finances and societal norms.  Outwardly, the Liang family seemed happy, but with persistent animosity between his parents, home often felt unsafe.

In 2000, Colin's father immigrated to San Francisco along with Colin and his sister in search of better opportunities.  His mother was forced to stay behind in China because the immigration petition would not extend to a former spouse.  PSR at ¶ 52.  The children lived the rest of their childhood with practically no contact with their mother.   Colin was devastated about moving to a foreign country with his father, who, back in China, was an authoritarian that rarely spent time with his children because he was too busy working or gambling with his friends.  The fractured Liang family took refuge with Colin's grandmother in a ten-foot by twelve-foot bedroom in a Single Room Occupancy building in Chinatown, sharing the kitchen and bathroom with ten other units on their floor.  PSR at ¶ 52.  While Colin's grandmother and sister slept in bunkbeds, Colin and his father slept on the hard floor which was often too cold for comfort.  The building was old, noisy, and crowded, with no heating.  Colin struggled to adjust to his new life without his mother in an environment where finding quiet moments to study were rare and privacy was nonexistent.

Within a year of immigrating to San Francisco, Colin's father moved to Puerto Rico in pursuit of a job working at a restaurant.  Colin and his sister were left in the care of their grandmother.  Their father would send money from Puerto Rico, but it was never enough to feed a family of three and so Colin and his sister relied on generosity of local churches and food banks for free meals and groceries.  PSR at ¶ 58.  (This is why today it means so much to Colin to be able to contribute to the Alameda Food Bank.  Exhibit B – Charitable Giving at 1-21.)

Despite the shock of living in a foreign country after effectively losing both his parents, Colin persevered.  He made quick friends with kids at school, many of whom are still in his life.  He joined a non-profit youth outreach program, volunteered in churches, and earned good grades all while

working part-time jobs.  In 2004, Colin graduated from high school.  PSR at ¶ 70; Exhibit C – High School Diploma.

### B.    ADULT LIFE

#### 1.    Early Career

At 18, Colin left the protection of his grandmother, the third and final parental figure in his life. From this point on, Colin began taking responsibility for the financial welfare of his grandmother as well as his parents.  He moved out of the room he shared with his sister and grandmother into a basement apartment in San Francisco where he lived alone.  He enrolled in San Francisco State University while working a part-time job at his cousin's business installing granite countertop and kitchen cabinets. PSR at ¶ 72.  After a year of college, Colin dropped out because it became too hard to support himself and his family financially while also handling a full load of courses.  He began working full-time at his cousin's business and was quickly promoted to store manager due to his strong work ethic.  As he developed client management skills and learned the ins and outs of operating a small business, Colin began to form a vision for his future as a business owner.

Eager to venture out on his own, in 2007 Colin launched his own countertop and kitchen cabinet business in Vallejo, California.  He recalls staying up all night due to the excitement he felt in securing his first client.  Despite his best efforts, the economic downturn forced him to close his business in 2008.  Without a job, Colin reached out to his father, who was by then living in Los Angeles, and joined him there to work in his  import-export business.  His father's business started out importing fresh garlic and ginger from China, but eventually expanded to exporting wood, cowhides, scrap tires, and other materials in demand.  Over the next few years, Colin gained insight into the import-export industry, formed new contacts, and developed valuable negotiating skills.  In 2011, this business experience helped Colin muster up the courage to start another business of his own.

#### 2.    Marriage and Family

That same year, Colin became engaged to the love of his life, Xiao Ying Liu.  Over the next decade, the couple worked hard to build a life together.  Colin dedicated long hours running BATR while Xiao Ying worked as a senior research associate at BioMarin Pharmaceutical.  In 2013, they purchased a home together in Daily City and were wed two years later.

The happy couple dreamt of growing their family but were unable to conceive a child even after many rounds of IVF.  After years of disappointment and heartbreak, in September of 2020 Colin learned his wife was pregnant.  PSR at ¶ 54.  On May 3, 2021, Colin and Xiao Ying welcomed their son, Nathan, with great anticipation and joy.

### 3.   Bay Area Tire Recycling

After years of working for his father, Colin felt he needed to venture out on his own again.  He never wavered in his goal of being a successful entrepreneur even though his first enterprise was not successful.  Colin learned about the tire waste and recycling industry while working for his father's import-export business between 2008 and 2011: tire shops would pay a third-party company to dispose of tires on their behalf, and those tires would then typically be shipped overseas to buyers (mainly in Asia) to be used as scrap rubber, fuel, or for other purposes.  Colin also learned that this industry relied heavily on brokers and freight forwarders:[2] brokers would bear the burden of securing foreign buyers on behalf of tire collection businesses, and freight forwarders would handle all the shipping arrangements to relieve tire collection businesses of the administrative burden of contracting directly with the shipping companies.  With this understanding, Colin founded Bay Area Tire Recycling, Inc ('BATR') in 2011.

Colin poured his heart and soul into building BATR.  A typical workday lasted 18-hours starting at 4:00 a.m. with hardly any breaks and eating his meals on the go.  Weekends were non-existent, and days off were all too rare.  Because he had invested most of his savings into purchasing a truck, warehouse, and bundling equipment, he initially did not have enough funds to hire the staff he needed for daily business operations.  Instead, Colin personally handled everything: clerical work at the office before dawn, loading and bundling used tires during the workday, maintaining the warehouse and equipment in the evenings, all while navigating relationships with various business contacts.

BATR's success was harder to achieve than Colin anticipated.  When the demand for rubber was high, brokers (and their foreign buyers) were willing to pay BATR for its scrap tires.  When the

---

[2] Freight forwarders often also functioned as brokers.

7

demand for rubber was low, however, BATR was forced to pay to have its tires be taken.

Furthermore, as a tire collection facility, BATR needed to adhere to a strict tire capacity limit that

demanded that Colin consistently find brokers that were willing to take his scrap tires in order to

operate a profitable business.  In a bad market, once BATR's facility had reached the legal capacity,

Colin could not collect any more tires which not only stopped BATR's source of revenue, but also

threatened the relationships he had built with local clients.  The volatility of the rubber market was a

great source of stress for Colin, and his once exciting business venture became an anxiety-inducing

rollercoaster.

## C.    OFFENSE CONDUCT

Colin first met Michael Choy, a purported broker, through the online platform Alibaba in 2012.

Between 2012 and 2013 Choy and Colin did business together, with Choy brokering sales for scrap

rubber in Asia.  Choy was not always fair to Colin in their business dealings, and Colin decided to

sever the business relationship.  In early 2014, after a period of silence between the two men, Choy

reappeared.  During a significant decline in the scrap rubber market, Choy offered to take Colin's tires

at no cost.  This was an appealing offer for Colin since the market demanded that BATR pay a broker

to take his scrap tires.  While the offer seemed too good to be true, Colin convinced himself that Choy

was trying to show goodwill in an attempt to rebuild their business relationship and accepted the offer.

Shortly thereafter, around the spring of 2014, Choy reached out to Colin again, but this time

with an offer to purchase bills of lading[3] from Colin.  Choy made it clear that he had no interest in the

commodities but was only interested in obtaining the related bills of lading.  Colin agreed to Choy's

offer and began reaching out to his contacts – brokers and freight forwarders – in search of more bills

of lading to provide to Choy.  Over time, Choy wanted more and more bills of lading and Colin did

his best to provide and was paid accordingly.  Notably, a vast majority of the bills of lading that Colin

forwarded to Choy came from his industry contacts rather than shipments related to BATR.

At first, Colin did not know the reason Choy was willing to pay for bill of ladings but had no

---

[3] A bill of lading is a document issued by a shipping company that acts as a receipt for a particular shipment: it documents the shipper, recipient, booking party, and contents of the shipment, along with relevant dates and transport information.

interest in underlying commodities.  But by the fall of 2014, Choy explained to Colin the value of the bills of lading: Choy was altering the bills of lading and providing them to people who would then use those fraudulent bills of lading to submit claim tariff rebates, called "drawbacks", for the recycling of petroleum derivatives Polyethylene Terephthalate (PET) and Ethylene tetrafluoroethylene (EFTE) plastics.  Colin eventually learned that Choy was selling these fraudulent bills of lading to TPP Export America, LLC (TPP Export) owned in part by Joshua Stanka and Joshua Clark.  Stanka and Clark would then use those bills of lading to file drawback claims with the U.S. Customs and Border Patrol for clients such as The Pacific Rim Traders, LLC (PRT).  PSR at ¶ 9.  But Choy still refused to share all the details of his scheme with Colin and aimed to limit Colin's role to finding and forwarding bills of lading to himself.  Nevertheless, Colin had enough information to know that he was breaking the law.  Regrettably, instead of walking away, Colin leaned into the scheme.

In September 2014, Colin reached out to PRT for a meeting with Dale Behm, its General Manager, in an attempt to work with PRT without Choy.  PSR at ¶ 11.  He reached an agreement with Behm to sell bills of lading to PRT at the rate of $24 per ton of listed cargo.  PSR at ¶ 11.  But neither Colin nor Behm acted on this agreement and no sales occurred.  Instead, Colin continued to provide Choy with nearly all of the bills of lading that were ultimately used in PRT's drawback claims filed between November 2014 and July 2017.  PSR at ¶ 13.  For his work, Choy paid Colin approximately $536,899.  PSR at ¶ 14.  Colin has tendered a cashier's check in the amount of his revenue in the scheme, $536,899, to defense counsel for full payment of his restitution due to the United States.  And while Colin personally paid other brokers at least $70,000[4] to acquire the bills of lading that were provided to Choy, this has not been accounted for in the calculation of his restitution amount of $563,899 which Colin agrees is fair and appropriate under the circumstances.

While Colin generally acted as a liaison in assisting Choy with the procurement of bills of lading from various freight forwarders, on one occasion, Colin directly provided Choy with bills of lading from BATR and ML Trading Group, entities both controlled by Colin.  In or about February

---

[4] The $70,000 figure was calculated based on numbers tracked in spreadsheets by Colin and his broker.  Colin was not able to locate all of the spreadsheets but believes the true cost to him was closer to $120,000.  All spreadsheets have been turned over to the government.

2016, at a time when Colin was having difficulty securing a buyer for his scrap rubber, he used ML Trading and BATR as booking companies and shipped dozens of containers of scrap tires to a company called Ssanyoung Ecotec Co., Ltd. (Ssanyoung) in Busan, South Korea.  PSR at ¶ 13.  Colin provided Choy with the bills of lading for this shipment and Choy then used these for his scheme of filing claims for drawback eligible plastic resins purportedly exported by ML Trading Group.  PSR at ¶ 24.  Ssanyoung, however, had already gone out of business at the time of the shipment and the containers were abandoned at the port of Busan.  Since Colin had used ML Trading as the booking party on these bills of lading, ML Trading was readily identified as the party liable to the shipper, Orient Overseas Container Lines (OOCL), for the storage and disposal fees when nobody picked up the shipment of scrap tires.  As a result, OOCL sued ML Trading and obtained a default judgment for $163,357.91.  As part of his efforts to take responsibility and make amends for his conduct, Colin paid OOCL $229,602.65 in satisfaction of the default judgment including interest.  PSR at ¶ 25; Exh. A.

On August 12, 2020, the government filed an indictment charging Colin with one count of conspiracy to file false claims in violation of 18 U.S.C. § 286; fifteen counts of filing false, fictitious, or fraudulent claims in violation 18 U.S.C. §§ 287 and 2; twelve counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2; two counts of violating 18 U.S.C. §§ 1341 and 2; one count of money laundering in violation of 18 U.S.C. §§ 1957 and 2; three counts of laundering monetary instruments in violation of 18 U.S.C §§ 1956(a)(2)(A) and (2); and one count of falsification of records to obstruct investigation in violation of 18 U.S.C §§ 1519 and 2.

On May 26, 2021, Colin pleaded guilty to count one of the indictment, conspiracy to file false claims under 18 U.S.C. § 286.  Since then, he has fully cooperated with the government and has committed to testify in any trial in which he is needed even after he has been sentenced.

### III.   ARGUMENT

#### A.   THE SENTENCING GUIDELINES

##### 1.   Applicable Guidelines

Mr. Liang agrees with the government that the U.S. Sentencing Guidelines, as applied in this case, yield an adjusted offense level of 21.  Plea Agreement ¶ 7.  Probation concurs with this calculation and notes that the advisory Guidelines, for a defendant like Mr. Liang with no criminal

1  history, yields a sentencing range of 37 to 46 months.  PSR ¶ 80.

2  **2.    Applicable Law**

3  "A district court should begin all sentencing proceedings by correctly calculating the applicable

4  Guideline range… the Guidelines should be the starting point and the initial benchmark… the district

5  judge should then consider all of the § 3553(a) factors…" *Gall v. United Sates*, 552 U.S. 38, 39

6  (2007).  The Guidelines are advisory, and the court is free to disagree with the Guidelines range and

7  stated policy considerations. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

8  When evaluating a sentence, the Court may not presume that the Guidelines range is

9  reasonable.  Instead, the Court "must make an individualized assessment." *Gall*, 552 U.S. at 39.

10  "While the Guidelines are to be respectfully considered, they are one factor among the § 3553(a)

11  factors that are to be taken into account in arriving at an appropriate sentence." *United States v.*

12  *Carty*, 520 F.3d 984 (9th Cir. 2008) (en banc).  This discretion reflects the "federal judicial tradition"

13  that allows "the sentencing judge to consider every convicted person as an individual and every case

14  as a unique study in the human failings that sometime mitigate, sometimes magnify, the crime and the

15  punishment to ensue." *Id*. at 598 (internal citation omitted).  Under *Carty* and its progeny, the Court

16  must consider Colin as an individual entitled to consideration of the § 3553(a) factors.

17  Thus, consideration of the advisory Guidelines range is subordinate to the mandate that the

18  punishment be a particularized sentence *minimally sufficient* to accomplish the statutory purposes of

19  sentencing. *See United States v. Carty*, 520 F.3d 987, 995 (9th Cir. 2008) (en banc) (emphasis

20  added).  To arrive at a sentence that is sufficient but not greater than necessary, the district court must

21  consider all the factors listed in 18 U.S.C. § 3553(a), and in doing so, may decide a downward

22  variance from the advisory Guideline range is appropriate. *United States v. Autery*, 555 F.3d 864 (9th

23  Cir. 2009) (affirming downward variance from a guideline range of 41-51 months to five years'

24  probation in possession of child pornography case after analysis of the 3553(a) factors).  Indeed, the

25  Supreme Court admonished that "the Guidelines are only one of [seven] factors to consider when

26  imposing a sentence," and that "§3553(a)(3) directs the judge to consider sentences *other than*

27  *imprisonment*." *Gall*, 552 U.S. at 59 (emphasis added).

28

**3.      Factors Relevant to a Sentence That is Sufficient, But Not Greater Than Necessary**

The Court's duty to impose a sentence "sufficient but not greater than necessary" reflects the four purposes of sentencing: retribution; general deterrence; specific deterrence; and rehabilitation. *See Carty*, 520 F.3d at 991; 18 U.S.C. § 3553(a)(2)(A)-(D).  In "determining the particular sentence to be imposed," the Court should consider these purposes, as well as the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution.  *See* 18 U.S.C. § 3553(a)(1)-(7).  In this case, Mr. Liang's proposed sentence of 6 months imprisonment, 3 years of supervised release, 300 hours of community service and a restitution order of $536,899 achieves this purpose.

**B.      18 U.S.C. § 3553(a) FACTORS**

**1.      Mr. Liang's History and Characteristics**

Mr. Liang's history and personal characteristics warrant a downward variance.  The many letters from his friends and family illustrate Mr. Liang's work ethic and family-centered values and show that his offense conduct was entirely out of character.  In his community, Mr. Liang has been "always a supportive, generous, humble and hardworking person that always put other[s] first before himself".  Exhibit D – Letters of Support at 1.  Joseph Williams, Jr., a long-time business contact, noted, "I am confident this has to be out of his character[s].  He is an honest, hardworking and generous person.  I guarantee this is just a one time lapse in judgment for him.  I have no doubt whatsoever he will learn from it and be a better person for his family and community."  Exh. D at 13.

Mr. Liang is a man who honors his family.  He is a dedicated son, loving husband, and more recently "is a proud father of a baby boy" who "he wants to be a good role model for".  Exh. D at 16. As his wife attests, "Colin has stepped up and taken over all baby duties and multiple feedings overnight so I can rest and recover.  He is also setting up supports and making arrangements for my son and I during his anticipated time away from the family."  Exh. D at 3.  Despite his childhood struggles of being separated from his parents, his wife notes that Mr. Liang shows great respect and deference to his parents and takes good care of them by paying their mortgage and utilities even when "he has to dig into his saving to sustain it."  Exh. D at 1.

All that Mr. Liang has achieved in his life was built on hard work and perseverance.  The greed

that led to his offense conduct was an anomaly in his life.  Bo Yu tells the Court, "[b]eing a business partner of his, I saw how hard he worked first hand." Exh. D at 8.   Another business associate also highlights Mr. Liang's work ethic:

> By working side by side with Colin, I could see he's a very hard working person.  He is not your typical sitting in office all day kind of boss. He really works. He does whatever it takes to make his business running smoothly. From a forklift driver, to a warehouse laborer, to a tire collector, etc. They are all labor intensive jobs. He does not mind getting dirty. He stays late at work to finish the tasks and being prepared for next day way after all his employees were gone for the days. I have seen many times that he was buried with dust from head to toes at work.

Exh. D at 13.  His wife, Xiao Ying, confirms that hard work is Mr. Liang's cornerstone.  She says that "there's not one position that is too dirty or too labor intensive for him. To say he's a hands-on boss is an understatement. When the truck is short a person, he never hesitates to grab a pair of work gloves and hops on the truck himself to cover the route for the day. […] Many times he would work a full day of manual labor handling tires with average weight of 100 pounds during a holiday to clear the backlog of tires in the warehouse while employees enjoy a paid day off…."  Exh. D at 1.  His mother also notes that while Mr. Liang has "sacrificed a lot", "[h]e never turned his employees away when [they] call upon for his help."  Exh. D at 6.  Indeed, Mr. Liang has a reputation for "always treat[ing] all his employees with the u[t]most respect and always help[ing] them when they need him most." Exh. D at 2.  "For example, [when] one of his drivers got into a big accident and instead of blaming him, he always told him not to worry and that he will support him no matter what happens…He is a hard worker and never blames his employees."  *Id*.

It is apparent to everyone in Mr. Liang's life, that he is warm, compassionate, and generous. Many of his letters speak of Mr. Liang's "kind heart" and "his generosity and desire to help others." Exh. D at 10 and 1.  Robert Van, shares a heartfelt story about how he filed for bankruptcy five years ago, losing everything including his home and Mr. Liang "took me in without a doubt and suggested to stay at his place until I pick myself up."  Exh. D at 5.  Van explained, "I have friends for 40 plus [years] that never offered their place as open arms as [Mr. Liang] did. He offered to help me financially and helped me to rebuild my credit as well. On top of his house and helping me financially, he also offered to help me finance a vehicle to get around for work."  *Id*.  Mr. Liang has

"never ignored people who came to him for help." Exh. D at 7.

The history and characteristics of Mr. Liang are substantial mitigating factors for the Court to consider. His conduct in this case is an aberrant departure from an otherwise exemplary life.

### 2.    Nature and Circumstances of the Offense

While Mr. Liang recognizes the seriousness of his criminal conduct, there are also mitigating circumstances that warrant a downward variance. First, Mr. Liang did not seek out Choy to get involved in a scheme to defraud the federal government. There is also no evidence to suggest that he was already engaged in criminal conduct that would indicate he was predisposed to participating in such a scheme. Rather, Mr. Liang is before this Court because he gave in to greed and made the mistake of crossing a line he knew he should not cross.

Second, while Mr. Liang participated in the scheme to defraud knowingly, he played a minor role in the larger conspiracy in that he did not devise the scheme nor was he privy to all its operations. He joined an existing scheme. In fact, when Mr. Liang initially agreed to sell bills of ladings to Choy, he understood that he was involved in something illicit, but was not specifically aware that the bills of lading were being used to submit false drawback claims. But he also acknowledges that he later learned the true purpose behind the bills of lading and remained involved in the scheme.

Third, while Mr. Liang does not object to the 20-point enhancement in his guideline calculations driven by a loss of more than $9,500,000 to U.S Customs and Border Protection, it is mitigating that he received a much smaller portion of this money – $536,899 to be exact. PSR at ¶¶ 12-13, 33. A loss figure that only accounts for the $536,899 Choy paid Mr. Liang would have resulted in a 12-point enhancement and a resulting a guideline range of 18 to 24 months rather than the guideline range of 37 to 46 months outlined in the plea agreement. Moreover, Mr. Liang has returned the $536,899 he was paid from the scheme without deducting his own costs which he considers as a form of financial penalty that he wholeheartedly accepts as appropriate.

### 3.    Remorse and Post-Offense Rehabilitation

Mr. Liang committed an offense which he will regret for the rest of his life. This moral failing has caused him great shame, and he has worked to make amends both to the individuals he harmed with his criminal conduct, including his wife and young son from whom he will soon be parted. In his

letter to this Court, Mr. Liang expresses his remorse:

> Looking back, I am so disgusted at myself and how I was so entitled to put my business above everything else…I was greedy and short-sighted that I ignored the facts and just wanted the best for my business and myself for selfish reasons.  My actions led me to lose the trust of my family, friends, and community, my freedom, my business, and potentially my home.

Exhibit E – Colin Liang's Letter to this Court at 3.  Mei Lian Guan, his mother, says that "He always tells me and other family members that he is very sorry because he created victims. He feels very guilty."  Exh. D at 6.  Mr. Liang's wife explains that he "is more than remorseful as he accepts responsibility … [and] [h]e is doing and will continue to do everything within his mean[s] to give back to the community and make thing[s] right."  Exh. D at 5.

Mr. Liang may have temporarily lost sight of the man he wants to be, but he is working hard to redeem himself.  He says in his letter to the Court:

> I cut off all the bad apples in life and went back to being humble, working hard and being grateful […] I want to earn back the trust my family has in me and repay the victims I have harmed […] I just want to give back to the community who has so supported me throughout my life. I want to desperately make amends and am trying my best to achieve that.

Exh. E at 3.  Mr. Liang's mother says in her support letter that she has witnessed Mr. Liang's remorse and attempts to make amends:

> The thing impresses me the most about Yong Heng is that he has become more mature and accountable the last 2 years. Once he learned he has broken a law, he had been very remorseful and shameful.  He started making amends.  The business that he worked extremely hard to build for over a decade, [h]e sold it without hesitation. Then he paid back all the restitutions to the victims and hope it can minimize the impacts to the victims he created. This is the nature of his character and morality.

Exh. D at 6.

The United States Supreme Court has recognized that post-offense rehabilitation "may, in appropriate cases, support a downward variance."  *Pepper v. United States*, 562 U.S. 476, 481-491 (2011)) (considering post-sentencing rehabilitation).  Although the *Pepper* Court's holding related to post-sentencing rehabilitation, the principles upon which the Court relied plainly apply as well in the

context of post-offense, pre-sentencing rehabilitation. *See, e.g., United States v. Robertson*, 662 F.3d 871, 878 (7th Cir. 2011); *United States v. Stewart*, No. 8:09CR282, 2011 U.S. Dist. LEXIS 89767 at *6-8 (D. Neb. Aug. 11, 2011); *see also United States v. Shy*, 538 F.3d 933, 938 (8th Cir. 2008) (affirming a variance to probation for post-arrest rehabilitation, noting that rehabilitation was genuine, and the defendant was a positive contributor to society).

Here, Mr. Liang has demonstrated significant post-offense rehabilitation that warrants this Court's consideration.  He has demonstrated true contrition as discussed throughout this memorandum.  He has fully cooperated and will continue to cooperate with federal authorities including a promise to testify at any trial related to this case.  He has paid his restitution in full – $536,899 to the United States for false claims and $229,602.65 to OOCL for the shipping containers abandoned in South Korea.  PSR at ¶ 25; Exh. A.  He has also found ways to make amends to his community by donating to charities close to his heart like the Alameda County Community Food Bank and by volunteering his time there.  Exh. B.  Mr. Liang's work ethic and heart for helping those in need has made him a valued volunteer.  So, when the food bank recently asked him to be a lead volunteer, he was overjoyed and grateful for another opportunity to "become a positive contributor in the community and a better man in the family.  That is the type of father I want my children to know." Exh. E at 3.

Mr. Liang makes no excuses for his past actions, and instead, vows to "continue to work hard on rebuilding myself, making amends, and being positive change in the lives of those around me." Exh. E at 3.  For these reasons, Mr. Liang's remorse and efforts to make amends weigh in favor of leniency.

### 4.    Seriousness of the Offense, Respect for the Law, and Just Punishment

The Supreme Court has warned, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (quotations omitted).  Mr. Liang has suffered, and will continue to suffer, significant consequences as a result of his prosecution.  He has not only taken responsibility for his offense conduct, cooperated with the government, and paid restitution in full, but he is also prepared to serve a custodial sentence

of 6 months, followed by three years of supervised release, and 300 hours of community service.  Mr. Liang requests that the Court consider that the seriousness of the offense has been partially mitigated by his cooperation with the federal authorities, and that he has suffered emotionally, professionally, and financially ever since federal agents knocked on his door.

Mr. Liang is a new father.  He will miss out on his son's precious first months, a significant personal loss for Mr. Liang.  And while he understands that such loss is the consequence of his poor decisions, what pains him even more is that his incarceration will be most keenly felt by his wife and son.

Further, being away from his child is a particularly grave punishment for Mr. Liang because he knows the pain of being abandoned by a parent.  Mr. Liang was separated from his mother from the age of fourteen when he immigrated to the United States and was never able to recover the lost time of that important parental relationship.  Exh. D at 6.  His mother says: "Because of this incident, Yong Heng […] will probably lose his freedom for some time […] I missed out a few years of my son childhood and understand he too will miss out on his son childhood for some time if sent to prison."  Exh. D at 6.  Mr. Liang's father also left Mr. Liang and his sister behind in San Francisco when Mr. Liang was 15.  According to his wife, "after the birth of our son that I see the biggest joy and sadness in Colin's eyes. The joy of being a father but also the sadness that he'll miss out on seeing our son grow for a period of time and have the burdens bestow upon me."  Exh. D at 5.  The pain of leaving his son is a particularly serious consequence for Mr. Liang.

Mr. Liang has also suffered irreparable damage to his reputation and has recently made the difficult decision to shut down BATR, the business and dream that he toiled over for the past decade. This was a painful, but necessary step for Mr. Liang given his desire to pay restitution in full and ensure that his loved ones would be provided for when he is incarcerated.  Finding work or starting a new business when he is released will also be difficult.  Mr. Liang will forever suffer the stigma of having a felony conviction.  He will continue to struggle daily against the panoply of regulations and rights-restrictions that make convicted felons' lives that much more difficult.  A congressional report authorized by the United States Government Accountability Office (GAO) demonstrates that there are

641 collateral consequences of a nonviolent felony conviction.[5]  Seventy-eight percent of the 641

collateral consequences, specifically 497 of them, may last a lifetime.  *Id*.  There are indeed a myriad

of laws, rules, and regulations that will continue to stigmatize and punish Mr. Liang even after he has

served his sentence.  "These restrictions amount to a form of 'civil death' and send the unequivocal

message that 'they' are no longer part of 'us.'"  *United States v. Nesbeth*, 188 F. Supp. 3d 179, 184

(E.D.N.Y. May 24, 2016) (citing Michelle Alexander, The New Jim Crow (2010) (varying downward

from a guideline range of 33 to 44 months imprisonment to one-year probation for a drug defendant

based in part on the number of statutory and regulatory consequences she faced as a convicted felon)).

       Mr. Liang requests that the court consider these factors in determining what punishment is just.

### 5. Cooperation

       In addition to entering a guilty plea, Mr. Liang has cooperated fully with the government's

investigation in this matter and has participated in two proffers thus far.  He has also committed to

testify in any future trial involving his co-conspirators, even after his sentencing trial, which

demonstrates his genuine remorse and acceptance of responsibility.  This Court "has the power to

consider a defendant's cooperation under § 3553(a), irrespective of whether the Government files a §

5K1.1 motion."  *United States v. Robinson*, 741 F.3d 588, 599 (5th Cir. 2014) (emphasis added).[6]

Nothing in the text of § 3553(a) suggests that a § 5K1.1 motion should be the exclusive means for

considering cooperation.  *Id*.  In fact, "a sentencing court's failure to recognize its discretion to

consider a defendant's cooperation under § 3553(a)(1) is significant procedural error."  *Id*.

       Moreover, this Court can also consider § 3553(a)(1) as a sweeping provision that not only

includes the history of the defendant's cooperation, but the characteristics evidenced by cooperation,

such as remorse and rehabilitation.  *Robinson*, 741 F.3d at 600 (internal quotations omitted).  Mr.

---

[5] *See* GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, Stakeholders Views on Potential Actions to Address Collateral Consequences, (Sept. 2017).

[6] Every circuit that has examined this issue has expressly stated that a court may consider evidence of cooperation under § 3553(a)(1) even in the absence of a § 5K1.1 motion.  *See e.g., Robinson, 741 F.3d at 600; United States v. Landrón–Class,* 696 F.3d 62, 77–78 (1st Cir. 2012), *cert. denied,* ––– U.S. ––––, 133 S.Ct. 1621, 185 L.Ed.2d 605 (2013); *United States v. Massey,* 663 F.3d 852, 858 (6th Cir.2011); *United States v. Leiskunas,* 656 F.3d 732, 737 (7th Cir. 2011); *United States v. Fernandez,* 443 F.3d at 33; *United States v. Doe,* 398 F.3d 1254, 1260–61 (10th Cir. 2005).

18

1    Liang's willingness to commit himself to fully cooperate with authorities even after any benefit he

2    could derive from that cooperation expires (because his sentence will have already been imposed)

3    merits special consideration.

### 6.    The Need for Adequate Deterrence and Protecting the Public

5          The Department of Justice acknowledges that "[s]ending an individual convicted of a crime to

6    prison isn't a very effective way to deter crime."[7]  And where a custodial sentence is imposed, it is not

7    the length of the prison sentence but the fact of incarceration that effectively provides general

8    deterrence for white-collar defendants.  As explained by U.S. District Court Judge Charles R. Breyer,

9    "the important thing about the sentencing guidelines is for a white-collar offender who is a corporate

10   white-collar offender, go to jail. … the length of the jail sentence is really irrelevant…But the

11   difference between three years and five years and eight years and 12 years, although it makes a

12   difference for the defendant, but in terms of a general deterrence, zero. I'm sorry. Zero." *See United*

13   *States v. Prithviraj R. Bhikha*, No. 19-CR-00115-CRB, Dkt. 149 at 42.  Mr. Liang is at extremely low

14   risk to re-offend by any metric; therefore, a prison term of 6 months and 300 hours of community

15   service, in addition to his arrest and prosecution, are enough to deter him from ever engaging in

16   criminal conduct again.

17         In addition, the idea of sentencing Mr. Liang to a harsher penalty to deter others – does not

18   work.  This is because would-be criminals are not aware of penalties for their prospective crimes, do

19   not believe they will be apprehended and convicted, and simply do not consider sentencing

20   consequences in the manner one might expect of rational decision makers.  *See* Michael Tonry,

21   *Purposes and Functions of Sentencing*, 34 Crime & Justice 1, 28-29 (2006) (citing articles published

22   in 1980, 1998, 1999, and 2003).[8]

23         Finally, there is no need for a lengthy prison sentence to protect the public from Mr. Liang.

24   _____

25   [7] U.S. Dep't of Justice, National Institute of Justice, *Five Things About Deterrence* (July 2014),
     http://www.ncjrs.gov/pdffiles1/nij/247350.pdf

26   [8] While *certainty* of getting caught and punished deters crimes, all empirical research shows that

27   harsher sentences deter virtually nothing at all: "[I]ncreases in severity of punishments do not yield
     significant (if any) marginal deterrent effects … Three National Academy of Science panels, all
     appointed by Republican presidents, reached that conclusion, as has every major survey of the

28   evidence." *Id.*

Mr. Liang has been a generous, loving, and dedicated husband, father, son, and friend as evidenced by the letters of support submitted to this Court.  He has been an asset to his community through volunteer work and donations to various charities.  He has accepted responsibility for his mistakes and demonstrated his commitment to making amends by cooperating with federal authorities.

## IV.   CONCLUSION

For the foregoing reasons, Mr. Liang respectfully requests that the Court impose a sentence of imprisonment of 6 months at FCI Lompoc followed by 3 years of supervised release, 300 hours of community service, and a restitution order of $536,899.


Respectfully Submitted,

DATED:  March 2, 2022                    /s/
                                         NAOMI CHUNG
                                         BRENDAN M. HICKEY
                                         Attorneys for Yong Heng Liang